# Weaver's Appeal.

A. and B., judgment creditors of the same defendant C., agreed to attack the title of the sheriff's vendee of C.'s real estate. A. agreeing in writing with B. that if successful after paying costs and expenses and his judgment, the judgment of B. should be paid out of the said real estate. They were successful. A. obtained title to said real estate and went into possession of it. It was more than sufficient to pay the costs and expenses and both judgments. A. however refused to pay B.'s judgment, alleging (1) that the agreement so to do was without consideration, (2) that B.'s judgment at the time of making the said agreement had already been paid, and this appeared to be true. B. thereupon filed his bill in equity, praying for specific performance of said agreement. *Held* (a) that there was sufficient consideration for said agreement, (b) that it was no defense that B.'s judgment had already been paid, for he was only asked to pay what he had expressly agreed to pay, (c) that equity had jurisdiction to enforce said agreement.

November 15th, 1886. Before GORDON, PAXSON, TRUNKEY, GREEN and CLARK, JJ. MERCUR, C. J., absent.

APPEAL from the Court of Common Pleas No. 2, of *Allegheny county :* Of October Term 1886, No. 244.

Appeal of Emily Weaver from the decree of said court dismissing her bill in equity wherein she was plaintiff and Martin Reed was defendant.

After bill, answer and replication were filed, Thomas C. Lazear, Esq., was appointed Examiner and Master. He made the following report to the court in which the facts of the case appear.

The facts disclosed by the evidence are as follows : In 1871 Henry Weaver, one of the plaintiffs, was the owner of a tract of land in Findley township, Allegheny county, containing about 180 acres, which, with other liens against it, was then

encumbered with a mortgage for $6,000, previously given by him to John Little, who afterwards assigned it to Samuel McClurkan. Weaver subsequently became insolvent, and this mortgage being unpaid, McClurkan foreclosed it and obtained judgment on the 7th of March, 1871, for $5,446.76, the amount then due on it. A *levari facias* was issued on this judgment, and the property was sold thereunder to John K. Stewart on the 1st of December, 1871, who soon after obtained the sheriff's deed for it.

Martin Reed, the defendant in this case, was a judgment creditor of Henry Weaver, having a lien on said land at the date of said sale, but his judgment was not reached in the distribution of the proceeds. But several years after this sale, in 1878, Reed received a message from John Barton, Esq., to call at his office in reference to his (Reed's) said judgment, and having accordingly called upon Mr. Barton shortly thereafter, he then made an arrangement with Mr. Barton to undertake the collection of this judgment. Mr. Barton had not been attorney for Reed in the judgment before that date, nor in any other business, and Reed had not been acquainted with him prior to that interview. Mr. Barton had at that time been informed of certain facts connected with the above mentioned sheriff's sale to John K. Stewart which he believed would render it fraudulent and void as against Henry Weaver's creditors, and it was his purpose to test the validity of that sale by proceedings on the Reed judgment. He accordingly issued a *scire facias* thereon, on the day Reed employed him for the purpose, and having revived it and levied on the same tract of land which had been sold in 1871 to John K. Stewart under the McClurkan mortgage, he had it sold in pursuance of such levy and knocked down to Martin Reed for $50, an amount barely sufficient to cover costs. The sheriff's deed to Reed for the property was acknowledged on the 6th of July, 1878. At the time Mr. Barton sent for Reed to come to his office he was, and had been for some time before, attorney for Emily Weaver, complainant in this case, and in connection with his son, Edward L. Barton, his partner, he then represented two judgments held by John Moody in trust for her against her husband, Henry Weaver, one for $1,300, the other for $650, on which it was at first contemplated by Edward L. Barton to take such proceeding as it was afterwards determined to pursue under the Reed judgment to attack Stewart's title to the land above mentioned. But as it was feared that if Mrs. Weaver's husband was found to be implicated in the alleged fraudulent transaction, relied upon to defeat Stewart's title, her claim might thereby be prejudiced before a jury, it was deemed advisable by Mr. Barton to use Reed's judgment

instead of Mrs. Weaver's in making sale of the land, and it was for this reason that Mr. Barton sent for Reed to come to his office. But so far from withdrawing from his connection with the judgments of Mrs. Weaver when he took charge of Reed's judgment, Mr. Barton revived them on the same day (the 12th of March, 1878,) on which he revived Reed's judgment, and continued thereafter to have the collection of her judgments in view no less than Reed's in all the subsequent proceedings. Mr. Barton's testimony before the Master in that connection was that he did not remember on which of the judgments he issued a *scire facias* first, but he added: "We had hers revived as well as his, and kept her claim as well as Reed's moving along together."

After the land was sold and the sheriff's deed delivered to Reed under his judgment, Mr. Barton brought an action of ejectment in Reed's name against John K. Stewart for the property, on the 21st of August, 1878, which, being afterwards tried, a verdict and judgment were recovered therein for the plaintiff, and this judgment having subsequently been reversed by the Supreme Court, a second trial was had, in which the plaintiff was again successful. This was followed again by an action for *mesne profits* brought by Reed against Stewart, and a judgment having been recovered against Stewart in that case another sheriff's sale of Stewart's interest in the same land took place thereunder, and though sold to Mr. Barton, the latter afterwards conveyed it to Reed.

The whole controversy in this case is substantially whether Martin Reed should be treated as holding the title to the land referred to, which he acquired under the proceedings above recited, in trust for Mrs. Weaver, and charged with the payment of her judgments as well as for the other purposes set forth in a certain paper, or agreement, hereinafter referred to and attached to complainant's bill of complaint.

Mrs. Weaver claims that not only was such the understanding and agreement of the parties at the time these proceedings were commenced and during their pendency, but that the question involved in the controversy has already been adjudicated in her favor by the award of arbitrators, to whom the whole matter was referred under an agreement of submission.

That such an agreement of submission was entered into, and such an award made as alleged in the bill, is not controverted. If, therefore, the award is binding, the question of what was the understanding and agreement of the parties as to this allegation of trust, need not be inquired into further in this case, the matter being then *res adjudicata*. It is proper, therefore, that this question, touching the validity of the

award, be disposed of first in order before considering the other question, whether such trust had ever existed.

Is the award, then, valid and binding on the parties? The fact is, as stated by the arbitrators in their certificate accompanying the award, that Reed revoked the submission before the award was made and delivered. If he had the right to revoke it, then the award was a nullity. It is contended, however, that he had no such right, and that the submission was irrevocable. But the Master discovers nothing in the agreement which would make it irrevocable. No rights were gained or lost by that agreement; nothing in its terms gives it the aspect of a compromise, and nothing appears on its face which amounts to more than a mere naked power to refer a subject of controversv to arbitration. Such a power is always revocable: Paist *v.* Caldwell, 25 P. F. Smith, 161; McGheagh *v.* Duffield, 5 Barr, 497.

The revocation in this case then being in time, the award made afterwards was without authority and void.

Leaving, then, this award out of the case, we go back to the question whether the land received by Reed in the ejectment against Stewart should be regarded as held by him in trust (*inter alia*) for the payment of Mrs. Weaver's judgment. In support of her allegation that Reed agreed to hold it, she produced in evidence a certain paper (a copy of which is annexed to her bill as Exhibit " B,") as follows:

" PITTSBURGH, PA., April 4, 1879.

" I hereby authorize John Barton, my attorney now conducting an action of ejectment for me against John K. Stewart, No. 412 of October Term, 1878, Common Pleas No. 2 of Allegheny county,'that in case of a recovery in said case, to adjust and settle the judgment in favor of Emily Weaver, Nos. 324 and 325 of April Term, 1878, (being one of the judgments against said land when sold at sheriff's sale to me,) out of the proceeds of said land, said proceeds to be applied first to payment of costs, fees and expenses of recovery, then to my judgment on which I sold and purchased the land; then out of the balance the judgment of said Emily Weaver is to be paid.                          MARTIN REED.

" Attest: JOHN BARTON."

This paper was signed by Reed and delivered to Mr. Barton some time before the trial of the ejectment, and Mrs. Weaver alleges in the bill that it was executed in pursuance of an understanding and agreement between herself and Reed prior to the said sheriff's sale to him, and in consideration of services rendered and to be rendered by herself and husband in the trial of that ejectment and in the recovery and collection of

Reed's judgment, Reed admitting that he executed and delivered this paper, and, therefore, if binding on Reed, the Master is of opinion that it establishes a trust such as is claimed by Mrs. Weaver, which would be a charge upon said tract of land. Reed, however, denies that it is binding on him for two reasons: First, because he says it was without consideration; and second, because he says he signed it believing that the judgments mentioned therein were valid, subsisting and unpaid, whereas they had been fully paid and discharged long before. If this paper were purely voluntary and without consideration, as alleged by Reed, it would not be a contract such as would bind him. But on this point the Master finds that Mr. Barton was attorney for Mrs. Weaver in respect to her judgments as much so as he was attorney for Reed in respect to Reed's judgment, and when he issued suits of *scire facias* to secure the judgments of both these clients he had the collection of Mrs. Weaver's judgments in view no less than Reed's, and in all the subsequent proceedings, including the ejectment and the sheriff's sale which preceded it, in Reed's name, he had the same object before him, never once losing sight of his professional relation to Mrs. Weaver. And in procuring Reed's signature to the paper in question, Mr. Barton acted as attorney for both parties and for their common benefit. It also appears, from the testimony of Mr. Barton, that both Mrs. Weaver and her husband furnished important evidence on the trial of the ejectment, without which Reed might not have recovered. And it seems, too, that a certain paper was obtained from Mrs. Weaver and used on the trial which was deemed by Mr. Barton to be a valuable document in Reed's favor, and there is hardly room for doubt that in the assistance thus rendered by Mrs. Weaver she was led to believe that her judgments would share in the fruits of the litigation. The Master considers all this state of facts sufficient to constitute a good consideration to make the paper in question a contract binding on Reed, and he should be held to it unless relieved from the obligation by the other objection he makes to it, consisting in the allegation that he signed it under the belief that Mrs. Weaver's judgments were valid and unpaid, whereas they had been paid long before that time. As to this allegation, the facts are as follows: Neither of the judgments mentioned in said paper was an original judgment, but both were entered in default of an appearance in suits of *scire facias*, one at No. 324, April Term, 1878, to revive judgment No. 400, November Term, 1869, which had been entered September 29th, 1869, for $1,300; the other at No. 328, April Term, 1878, to revive judgment No. 412, November Term, 1870, which had been entered September 23d, 1870, for $650, the plaintiff in each of

said judgments being John Moody, trustee of Emily Weaver, and the defendant, Henry Weaver. These judgments were revived on the 12th of March, 1878, for their full amount, with interest, including the judgment at No. 324, April Term, 1878, being for $1,976, and the judgment at No. 328, April Term, 1878, for $942.50. But the original judgment, No. 400, November Term, 1869, so revived had really been paid in April, 1871, by an appropriation to it in full of debt, interest and costs under the sheriff's special return of a *levari facias* at No. 121, April Term, 1871, in which Alexander Thompson, administrator of Daniel Morgan, was plaintiff, and Henry Weaver was defendant. The real estate sold under that writ was a different tract of land from that in controversy in the aforesaid ejectment, and is known as the Morgan farm. Mrs. Emily Weaver became the purchaser of that farm at that sale on the 24th of April, 1871, for about $5,300, and this judgment was credited as part of the purchase money in the sheriff's special return, so that though she never received payment of it in cash she got its equivalent in the property purchased.

\*          \*          \*          \*          \*          \*          \*          \*

The two judgments in question having then been fully paid before Mr. Barton revived them, is it competent now, since they have been revived without objection on part of Henry Weaver, for Martin Reed to set up the fact of such payment as a defence to the payment of the judgment so revived out of the proceeds of the land since recovered by him in the aforesaid ejectment. The Master is of the opinion that though this might have been a good defence to the revival of the judgments if Henry Weaver had seen fit to avail himself of it, Reed cannot maintain such defence in this case, for even if it be conceded that Henry Weaver committed a fraud in permitting these judgments to be revived in favor of his wife after they had once been paid, Reed was not injured by the fraud; and, therefore, it was a matter of no concern to him whether they had been paid or not, or whether they were even founded on an original indebtedness. In consideration of the collection of his own judgment by means of her assistance, as well of the services of Mr. Barton, her counsel as well as his, he agreed that the judgments so revived should be paid out of the proceeds of the land he was then seeking to recover, if successful in the suit, and this, too, without any other condition; and having been successful, why should not these judgments be paid accordingly. The evidence shows that the land recovered is worth, at least, $8,000.00, and has a yearly rental value of $400.00, so that by his success in the ejectment Reed has not only made his claim in full, but after paying all costs, fees and expenses of recovery, and the entire amount of Mrs. Weaver's judgment,

he will still have made a handsome profit in addition thereto out of the litigation. It has been held that a fraudulent judgment like a fraudulent deed is good against all but the person intended to be defrauded by it: Meckley's Appeal, 102 Pa. St., 536; Munroe v. Smith, 79 Id., 459. And if the same principle is applicable to this case, as it surely is, it does not lie in Reed's mouth to question the validity of Mrs. Weaver's judgments.

But while in the view of this question taken by the Master, it is not deemed material what, if any, consideration there was for the judgments in question, the Master finds that these judgments were originally given for money loaned and advanced by Mrs. Weaver to and on account of her husband, from time to time, for the payment of his debts, and that this money was part of her separate estate derived from her father and other relatives, and none of it from her husband. It also appears that, in addition to this, she also paid for her husband since those judgments were given, and with money derived from the same sources, other debts of his for which he had given her no obligations, amounting in all, according to Henry Weaver's testimony in this case, to not less than a thousand dollars. And it was further in evidence, that the Morgan farm which Mrs. Weaver purchased in 1871, though she then took possession of it, and with her family retained the possession till 1879, it was then swept from her by the foreclosure of the Jane Wallace mortgage, which she and her husband had given at the time she bought it at sheriff's sale for the purpose of raising part of the purchase money. Possibly the anticipation of this event, in connection with the fact that he was indebted to her for other moneys for which she held no security, may have moved Henry Weaver to make no defence to the revival of his wife's judgments, for though paid in one sense, they were never paid to her in cash, and though she had not been deprived of the possession of the Morgan farm when these judgments were confirmed, he doubtless knew that she would be compelled to give it up sooner or later, and, in fact, it was sold from her only the next year. If he had seen fit to give her new and original judgments to make good to her these losses he would have been bound by them morally and legally. Why could he not have treated the old judgments as sufficient for that purpose, notwithstanding they had been paid, for a judgment though paid in full may by agreement between the parties be kept alive to secure new loans and advances: Pierce v. Black, 14 W. N. C., 295; Shank's Appeal, 9 Casey, 371; Mitchell v. Coombs, 15 Norris, 430.

And the Master conceives of no reason why, as between

themselves and as against all persons not intended to be defrauded thereby, the judgments referred to could not have been kept in existence to secure Mrs. Weaver for the moneys she had paid for her husband's indebtedness and the losses sustained by her on his account, though forming no part of the consideration of the original judgments.

The master is, therefore, of opinion that, under all the facts of the case, the complainants are entitled to a decree as prayed for, except as to the award named in the prayer of the bill and every reference to such award.

Exceptions were filed to this report, EWING, P. J., filing *inter alia* the following opinion :

We cannot agree with the Master that Reed prior to his agreement of 4th April, 1879, was under any obligations to share the proceeds of his doubtful litigation and expense with Mrs. Weaver. Any intention of Mr. Barton in the premises is immaterial. The evidence fails to disclose anything which, in our judgment, would affect Reed with any such trust or with notice of any such intention on the part of Mr. Barton.

Mr. Reed was the sole owner of the land under the title acquired by the sheriff's deed to him.

On the 4th of April, 1879, nine months after he had acquired title, more than six months after he had instituted his ejectment, and without a word having been passed between him and Mrs. Weaver or her husband (if the testimony is to be believed,) at the instance and request of his attorney, Mr. Barton, who was also attorney for Mrs. Weaver, Mr. Reed signed the paper—Exhibit "B," attached to the bill of complaint—to wit : ,

"PITTSBURGH, PA., April 4th, 1879.

"I hereby authorize John Barton, my attorney, now conducting an action of ejectment for me against John K. Stewart, No. 412 of October Term, 1878, Common Pleas No. 2, of Allegheny county, that in case of a recovery in said case to adjust and settle in favor of Emily Weaver, Nos. 324 and 325 April Term, 1878, (being one of the judgments against said land when sold at sheriff's sale to me), out of the proceeds of said land ; said proceeds to be applied first to payment of costs, fees and expenses of recovery, then to my judgment on which I sold and purchased the land, then out of the balance the judgment of said Emily Weaver is to be paid.

"Attest : JOHN BARTON,　　　　MARTIN REED.

Under these circumstances it was due to Mr. Reed that a full disclosure of the facts should have been made to him before he was asked to sign the paper. Mr. Barton, representing both parties, was bound to make known the facts as he knew them, and if anything was represented to Mr. Reed

which either Barton or the Weavers knew to be untrue, it should avoid the agreement.

Mr. Barton, called by plaintiffs, says, page 28 of testimony, as to what occurred at time of signing: " Mr. Reed believed these were valid and subsisting judgments."

Mr. Reed says that he was so informed. The agreement was pressed on Mr. Reed on the ground that it would be a great hardship on Mrs. Weaver if these judgments that had been revived on the same day with his own, were not paid, when, in truth and fact, their revival was a fraud on him and other *bona fide* creditors of Henry Weaver.

The testimony is clear on the point, and the Master finds that the original judgments on which these judgments (revivals) of Mrs. Weaver were based and to the payment of which Mr. Reed was persuaded to agree had been paid before the writs for revival had been issued, and the Weavers knew it.

It is true, as the Master declares, that, as a matter of law, these may have been good judgments against Henry Weaver, he having consented to their revival, and for some purposes they are good against third parties and creditors, but this is not such a case.

The Master finds a hardship on the part of Mrs. Weaver that in some other transactions Henry Weaver had used her money, and that by misfortune she afterwards lost a part of the money paid her on the original of these fraudulent judgments. To us the evidence for the Master's findings is very shadowy. We would have come to a different conclusion; but, be this as it may, there is no dispute as to the fact that these judgments were represented to Mr. Reed in an entirely false light, as an inducement for him to sign the agreement, and that under circumstances where *uberrima fides* was the rule of obligation to him. We are of the opinion that on these facts the complainant is not entitled to recover. Even if the agreement be binding, we doubt the jurisdiction of a court of equity to enforce it had it been free from the taint surrounding it.

So much on the facts as claimed by the parties. Two of the present judges of this court sat in the different trials of the ejectment case of Reed v. Stewart. The first is reported in Supreme Court cases in Stewart v. Reed, 10 Norris, 287, and the second is not reported. In both cases it was with great hesitation that we permitted the verdicts to stand.

Had the disclosures of the present case been made on these trials the verdicts would probably have been different; if not, it is very certain that no verdict for the plaintiff would have been allowed to stand.

We more than suspect that there was a bargain for the tes-

timony of witnesses, whom that trial posed before court and jury as disinterested witnesses.

The testimony of Henry Weaver and the paper produced by Mrs. Weaver, showing the amount she received from Stewart, were potent in these cases, and now as a court of equity we are asked to aid the Weavers, or Mrs. Weaver, in again recovering the same money from the proceeds of the land—taken from Stewart. We refuse aid in such a transaction. This case should have been settled out of court, and especially should it have been kept out of the court in which the case of Reed *v.* Stewart was tried.

The exceptions to the Master's report are sustained, and the bill is dismissed, the costs to be paid equally by plaintiffs and Martin Reed.

And now, September 29th, 1886, this cause came on to be heard, and was argued by counsel, and thereupon, upon consideration thereof, it is ordered, adjudged and decreed that the plaintiffs' bill of complaint be dismissed out of this court.

The plaintiff thereupon took this appeal and assigned the decree of the court for error.

*Fitzsimmons* (*Robb* with him) for appellant.—There is no particular formality required or necessary to the creation of a trust. Any agreement or contract in writing made by a person having the power of disposal over property whereby such person agrees or directs that a particular parcel of property or a certain fund shall be held or dealt with in a particular manner for the benefit of another, in a court of equity, raises a trust in favor of such other person against the person making such agreement, or any other person claiming under him, voluntarily or with notice, and the statute of frauds will be satisfied if the trust can be manifested or proved by any subsequent acknowledgment by the trustee, as by an express declaration, or any memorandum to that effect, or by a letter under his hand, or by his answer in chancery, or by his affidavit, or by a recital in a bond or deed, or by a pamphlet written by trustees —in short, by any writing in which the fiduciary relation between the parties and its terms can be clearly read: Reed *v.* Lukens, 44 Pa. St., 200; Cressman's Appeal, 42 Id., 147; Rees *v.* Livingston, 41 Id., 113; Willard *v.* Willard, 56 Id., 119; Uran *v.* Coales, 109 Mass., 581; Raybold *v.* Raybold, 20 Pa. St., 308; Perry on Trusts, vol. 1, sec. 82, p. 67; Smith *v.* Tome, 59 Pa. St., 158; Hays *v.* Quay, 59 Id., 263.

These judgments were properly revived for the amount shown to be due by Henry Weaver to Mrs. Emily Weaver: Pierce *v.* Black, 14 W. N. of C., 295; Shenk's Appeal, 9 Casey, 371; Mitchell *v.* Combs, 15 Norris, 430.

These judgments are also good and valid as against Henry Weaver and Martin Reed. Reed cannot complain, as he says he had notice respecting them before he signed the trust paper: McKley's Appeal, 102 Pa. St., 536; Monroe v. Smith, 79 Id., 459.

The remaining question is the jurisdiction of the court of equity in this cause.

This question, we submit, is easily disposed of. If we are correct in our premises, a trust was raised or created in Martin Reed or in John Barton, Esq., the agent, attorney or trustee of both parties. That trust is not denied, at least as to part of the same, as Martin Reed has carried out a portion of the trust agreement. He has provided for the payment of the fees of Mr. Barton, the counsel, in the proceedings. That was a part of the trust agreement. How can he affirm a part of a trust and, at his option, repudiate the balance? He must affirm all or repudiate all. His act in affirming part affirms all. We submit there can be no escape from this conclusion. If there was a trust in this case, then the court of equity has jurisdiction.

*C. S. Fetterman,* for appellee.

Mr. Justice GREEN delivered the opinion of the court, January 3d, 1887.

There can be no question of the jurisdiction of a court of equity over this cause if the paper of April 4th, 1879, executed by the defendant, is a valid obligation. That paper directed Mr. Barton, as attorney for the defendant in an ejectment case then pending, in case of recovery, to pay out of the proceeds, first the costs, fees and expenses of recovery, then the judgment of the defendant against Henry Weaver, and next the judgment of Mrs. Weaver, the plaintiff, also against her husband, out of the balance in Mr. Barton's hands. Had the land been converted into money by Mr. Barton, it would have been his duty to apply the proceeds in accordance with the directions contained in the paper, but that was not done, and the title to the land recovered still remains in the defendant who refuses to pay the plaintiff any part of the judgment held by her. If he was bound to make such payment because of the recovery of the land in question, when the recovery was had he held the title not only for his own benefit, but also for the benefit of the plaintiff, the present appellant, to the extent of the amount of her judgment, and to that extent he was a trustee of the title for her. No serious question, however, is raised as to the jurisdiction in equity. The important contention of the appellee is that the paper of April 4th, 1879, is not

a binding obligation because it was without consideration, and also because the judgments of Mrs. Weaver had been paid, and that fact was not communicated to Reed before or at the time he executed the paper. On both these subjects we find ourselves constrained to agree with the Master in his findings and conclusions, and to differ with the learned court below.

It was found by the Master and was made very clear by the testimony of Mr. Barton that he, Mr. Barton, was counsel for Mrs. Weaver before any steps were taken to recover the land from Stewart, and before he had anything to do with Reed or even knew him. Mr. Barton's son was more particularly concerned for Mrs. Weaver in the matter of her judgments against her husband, and it was he who first called his father's attention to the facts which it was supposed would invalidate Stewart's title. It was then and in the interest of Mrs. Weaver, that Mr. Barton advised that if the facts in question could be established the Stewart title could be defeated, but he at the same time advised that the proceedings to sell out Henry Weaver's interest had better be commenced on some other judgment than his wife's. Reed being a judgment creditor, it was thought best to sell under his judgment. He was accordingly communicated with and assented to the arrangement when it was explained to him. Mr. Barton testified, "up to that time I had not been attorney for Martin Reed, but shortly after Mr. Reed called." He also said, "the idea was to proceed originally on Mrs. Weaver's judgments. That was Ed's idea and Smith's. Then Mr. Reed came and saw me and I heard his statement, which corroborated what I had heard before, except there was a paper outstanding which had been executed, but we did not know where it was. We were anxious to get possession of it." He also said that the paper of April 4th, 1879, "was executed to show what should be done with the proceeds of the property in case it should be recovered," that he had a conversation with Reed because Mrs. Weaver had inquired what was to become of her, or what was to be done with her judgments in case he recovered, and that Reed said "he intended to have his own judgment out of it, and if there was any surplus left after paying expenses and his claim, he had no objection to her getting her claim out of it." Then he wrote the paper of April 4th, 1879, read it to Reed, who signed it and the proceedings went on. He also testified that he "said there was no impropriety in two creditors joining together to attack the sale, but to avoid reflections we would not call her as a witness. It was fully understood between him and me that the paper in Mrs. Weaver's possession would be important on the trial, which it was. Mr. Reed also had the understanding that we represented Mrs.

Weaver's claim as well as his own. This was understood the first time we talked it over, when Reed first came. I gave him the reason also why we did not want to sell on Mrs. Weaver's judgments. I do not remember on which of the judgments we issued the *scire facias* first, but we had hers served as well as his, and kept her claim and Reed's moving along together. This agreement in writing was made because Mrs. Weaver had asked if her matter was all right. When she saw the paper, she complained that she was not on an equal footing with Mr. Reed, but when I explained that he had taken the burden of costs on himself she seemed satisfied."

We think the testimony clearly discloses a case in which two judgment creditors of the same defendant agree to attack the title of one who had purchased the land of that defendant, and if they succeeded in the effort, each was to be paid in any event the amount of their several judgments, if the proceeds of the recovery reached so far. When it is considered also that the counsel for one of the creditors, being desirous of collecting his client's judgments, and discovering that for certain reasons it was desirable to proceed on some other judgment, advised that the other judgment creditor be brought in, and this was done, and the latter consented to join in the effort, having his own benefit in view, and then knowing that the first creditor's judgments were also being enforced and her interest carried along with his own, and with this knowledge agrees in writing while the proceedings are pending, and before the results could be known that she should be paid out of the proceeds the amount of her judgments, in case of success, it is not possible to say that such agreement was void because there was no consideration to support it. So far as Reed is concerned he obtained the benefit of the services of Mrs. Weaver's counsel to do that for him which neither he nor any other person for him had ever thought of or advised to be done. He obtained highly important testimony which was in her possession, and which she permitted him to use in order that a recovery might be had, not for his benefit alone, but for their joint benefit—he obtained her acquiescence in a proceeding on his judgment only for the sale of the land, when she might have refused her permission or insisted upon the proceeding being conducted on her own judgments exclusively; she allowed him to use her own counsel throughout the proceedings as his counsel also, being under no obligation to do so, but for their joint advantage only, and not for his own sole advantage—and far more than this, she accepts from him an agreement in writing that she shall be paid out of the proceeds as well as himself, and on the faith

of that agreement desists from all further action on her own judgments, and permits him to acquire for $50 the title to a tract of land worth at least $8,000, which, but for his conduct and his agreement was accessible to her as well as to him. The consideration for the agreement was ample and entirely sufficient to sustain it, in any point of view.

But it is also objected, and was held by the court below, that because the judgments of Mrs. Weaver had been paid in some other manner and by virtue of other proceedings, she can not have payment out of these proceeds. If this were a case of conflicting claims upon a common fund, and the payment of the Weaver judgments would be in prejudice of the Reed judgment, there would of course be the greatest force in this objection, and it would certainly prevail. But no question of that kind arises. The judgments of Mrs. Weaver against her husband were regularly revived, and as against him they were perfectly good. Reed, with a knowledge of the revival and of the amounts of the judgments, agrees that they shall be paid out of the proceeds of the recovery if, after paying all costs and expenses his judgment is first paid in full. The proceeds are far more than enough to pay all costs and expenses, his judgment in full and the judgment of Mrs. Weaver in full, and still leave a considerable profit to Reed. How, then, is he injured or defrauded by the enforcement of his agreement? Of course he is not defrauded because he is only asked to pay what he expressly agreed to pay, and he is not injured in the slightest degree, because there is an ample fund in his possession with which to pay both himself and the plaintiff. In other words, he gets every benefit from the contract which he stipulated to get, and more besides, after paying Mrs. Weaver the whole of her claim. He is in no position to say that the judgments were paid in some other manner. It is no concern of his. He sustains no injury by being obliged to pay the plaintiff's claim. He is simply prevented from making, at her expense, a considerable sum of money which he never bargained for, which he was not entitled to upon any aspect of his contract, and which, in our opinion, it would be highly inequitable and unjust to permit him to keep.

The decree of the court below is reversed at the cost of the appellee, the plaintiff's bill is reinstated and the record is remitted with instructions that a proper decree be entered in accordance with the foregoing opinion.